UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAID ABOELELA, | : | |
| Plaintiff | : | No. 4:CV-08-1062 |
| vs. | : | (Complaint Filed 06/02/08) |
| | : | (Judge Muir) |
| F. FASICIANA, et al., | : | |
| Defendants | : | |

**MEMORANDUM AND ORDER**

September 22, 2009

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Plaintiff, Said Aboelela, an inmate formerly confined in the Canaan United States Penitentiary, ("USP-Canaan"), Pennsylvania, filed the above captioned action pursuant to the Federal Tort Claims Act ("FTCA") and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971). The named defendants are the following USP-Canaan employees: Warden Cameron Lindsay, Clinical Director Dr. Odeida Dalmasi, Physician Assistant (PA) Francis Fasiciana, Retired Health Services Administrator (HSA) Frank Coleman, Assistant Health Services Administrator (AHSA) Jayne Vander Hey-Wright, and former Public Health Services (PHS) Pharmacist Kelly Stankiewicz. Plaintiff

complains of defendants' deliberate indifference and medical malpractice with respect to his serious medical needs. (Doc. 1, complaint).[1]

Presently pending before the Court is defendants' motion to dismiss or, in the alternative, for summary judgment. (Doc. 21). The parties have fully briefed the issues and the motion is now ripe for disposition. For the reasons that follow, the Court will grant the defendants' motion for summary judgment.

## I.   Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment " . . . forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

1. A claim against a department or agency of the United States is not cognizable under the Federal Tort Claims Act. Furthermore, as long as the officials or employees of the United States were acting within the scope of their duties or employment they cannot be named as defendants and only the United States can be so named. 28 U.S.C. § 2679(a); Smith v. United States, 499 U.S. 160 (1991). Plaintiff has not alleged that the individual defendants were acting outside the scope of their employment. The Government in its brief has suggested that the United States should be substituted as the defendant with respect to the claims brought pursuant to the Federal Tort Claims Act. Plaintiff did not respond to that argument and we will substitute the United States as a defendant with respect to Plaintiff's negligence claims under the Federal Tort Claims Act.

party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v.

Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corporation v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

**II. Statement of Facts**

From the pleadings, declarations and exhibits submitted therewith, the following facts can be ascertained as undisputed.

On October 5, 2005, Aboelela was transferred from the Metropolitan Detention Center, Brooklyn ("MDC-Brooklyn"), New York, to USP-Canaan. (Doc. 25-13, Ex. A, Att. A, BOP SENTRY Report, Public Information Inmate Data). He remained at USP-Canaan until his transfer to another institution on September 25, 2007. Id. Upon his arrival at USP-Canaan, Aboelela underwent a medical intake screening, in which a positive purified protein derivative of tuberculin ("PPD") test from May 23, 2005 was noted on the "Federal Prisoner In Transit" form from MDC-Brooklyn. (Doc. 25-16, Ex. 2, Att. B, Chronological Record of Medical Care at p. 85). This information was added to Aboelela's intake screening form. Id. at p. 199. As a result, Aboelela was referred to the chronic care clinic for follow-up regarding the positive PPD test. Id.

On October 19, 2005, although he was previously screened, Aboelela was seen by PA Fasiciana for Admissions and Orientation. Id. at p. 84. Aboelela expressed his concerns regarding a toenail fungus he had "for years" and "dark spots around his eyes" which he reported as having for over a year. Id. Aboelela had his vitals read, and was counseled regarding his concerns. Id.

On October 20, 2005, Aboelela was examined by Dr. Dalmasi. Id. at p. 83. Dr. Dalmasi discussed Aboelela's positive PPD test and informed him of types of isonicotinic acid hyudrazid ("INH") treatment options for latent tuberculosis.[2] Id. Dr. Dalmasi educated Aboelela on the benefits and risks of Isoniazid (INH) therapy. (Doc. 25-16, Ex. 2, Att. B, at p. 83). Aboelela stated that hepatitis was common in his home country of Egypt. Id. He agreed to the INH treatment, but he

2. One type of INH therapy, which has been used since 1952, is Isoniazid, which is a common brand name of an antibacterial drug used to prevent tuberculosis infection. (Doc. 25-20, Ex. 3, Declaration of Odeida Dalmasi, at ¶ 30 and Ex. 4, Declaration of Commander Tom Horeis, Chief Pharmacist, at ¶ 2). The BOP's Clinical Practice Guidelines for the Management of Tuberculosis(see Doc. 25-24, Ex. 2, Att. A) provide for treatment of latent tuberculosis with either INH or Rifampin. (See Doc. 25-20, Ex. 3, Dalmasi Decl. at ¶ 3).

requested a complete evaluation of his liver function prior to starting the treatment. Id. Dr. Dalmasi ordered a blood test, requesting a complete blood count, complete metabolic profile, and a lipid profile. Id.

On October 26, 2005, Aboelela gave blood for testing. (Doc. 25-17, Ex. 2, Att. B at p. 137).

On November 2, 2005, Dr. Dalmasi reviewed the results, (id. at 148), and determined that Aboelela's complete blood count and complete metabolic count, which included bilirubin levels, were within normal limits. (Doc, 25-26, Ex. 2, Att. B at pp. 81-82). It was also noted that Aboelela's hepatitis profile was negative. Id. at 148.

With Aboelela's consent, Dr. Dalmasi prescribed INH therapy to Aboelela for latent tuberculosis prophylaxis, in accordance with BOP Clinical Treatment Guidelines. (Doc. 25-20, Ex. 3, Dalmasi decl. at ¶ 9; doc. 25-16, Ex. 2, Att. B. at 81-82; and doc. 25-25, Ex. 2, Att. A at 10). Aboelela was informed of the

guideline instructions[3], and he agreed and verbalized that he understood them. (Doc. 25-16, Ex. 2, Att. B at 81-82).

On November 3, 2005, Aboelela's chart was reviewed by the pharmacist. Id. at 79.

On November 4, 2005, Aboelela began INH therapy. Id. at 186.

On November 7, 2005, Dr. Dalmasi examined Aboelela during a follow-up for his blood pressure. Id. at 78-79. Aboelela was asymptomatic; his blood pressure was high at 157/102; his pulse was 88; and his dissolved oxygen was 97. Id. Dr. Dalmasi diagnosed Aboelela with uncontrolled hypertension and prescribed a 30-day course of medication as treatment to lower

---

3. Dr. Dalmasi noted that although the risk of INH-induced Hepatitis increases with age, age 46 (Aboelela's age at the time he began INH therapy) is not too late to start INH treatment for latent tuberculosis. (Doc. 25-20, Ex. 3, Dalmasi decl. at ¶¶ 3, 4). The risk of INH-induced Hepatitis doubles, however, when a patient is age 50 or older. Id. Even at this doubled rate, the risk of developing Hepatitis from INH treatment is 23 out of 1,000. Id. The medical literature suggests that monthly monitoring of liver function should be performed when prescribing Isoniazid; however, if Rifampin is used to treat latent tuberculosis, monitoring is recommended after the initial two weeks of therapy. Id. at ¶ 5 (citing http://products.sanofiaventis.us/rifadin/Rifadin.pdf). This is noted on one of the BOP's commonly-used forms for tracking liver function during INH treatment, which is included in Aboelela's medical records. Id. at ¶ 5.

the blood pressure. Id. Dr. Dalmasi also prescribed aspirin, ordered a follow-up in 30 days, submitted a request for an EKG, and ordered a low-salt diet for Aboelela. Id.

In November, 2005, Dr. Dalmasi accepted a position at the Federal Detention Center in Philadelphia. (Doc. 25-20, Ex. 3, Dalmasi decl. at ¶ 11). Because of his transfer, he did not examine Aboelela again. Id.

On December 2, 2005, Aboelela was examined by PA Fasiciana "for renewal of medication as advised on 11/7/05." (Doc. 25-26, Ex. 2, Att. B at 78). Aboelela voiced "no complaints", except that he had "a sore left submandibular area for 5 days but 'I feel good.'" Id. Aboelela weighed 226 pounds, his blood pressure was 122/70, and his eyes, ears, nose, and throat were clear with no swelling of the lymph glands. Id. PA Fasiciana's analysis was that Aboelela's blood pressure was under control with medication and that INH treatment was progressing without complication. Id. PA Fasiciana recommended that Aboelela's blood pressure medication be continued. Id. PA Fasiciana informed Aboelela that his INH-monitoring blood work would be performed later in December, pursuant to Dr. Dalmasi's November 2, 2005 notation. Id. PA Fasiciana recommended that Aboelela

be added to the hypertension clinic for an examination in February. Id. PA Fasiciana noted, "Inmate advised of findings. Advised to watch callout in Dec[.] for lab work. Return to clinic as needed. He agreed and understood." Id.

On the evening of December 25, 2005, Aboelela walked to the Health Services Unit from his housing unit after his unit officer called and reported that Aboelela was sick. Id. at 77. Aboelela was seen by Emergency Medical Technician (EMT) Jeremy Simonson, who noted that Aboelela complained of having stomach cramps and nausea for five days and reported that he had vomited three times that night. Id. EMT Simonson observed that Aboelela was alert and oriented times three, with no acute distress and no shortness of breath. Id. He showed no signs of dehydration and reported that he had not been able to eat, but had forced himself to eat that day. Id. Aboelela did not complain that he was experiencing nausea during the examination. Id. EMT Simonson noted that Aboelela did not have abdominal pain, abdominal sounds were noted as negative, and Aboelela did not complain of pain upon palpitation. Id. Normal bowel movement was noted, and bowel sounds were good "times four." Id. Aboelela stated that his urine was dark and that he

“was concerned about INH [treatment].” Id. His vitals were taken, his blood pressure was 154/94, his heart rate was 94 beats per minute, respirations were 16, and his body temperature was 97.4 degrees. Id. EMT Simonson performed an EKG test. Id. He then determined that Aboelela was experiencing abdominal discomfort and vomiting and directed Aboelela to report to the Physician’s Assistant in the morning, to increase his intake of clear fluids, to eat toast or dry cereal if hungry, and to avoid spicy or dairy foods. Id.

On December 26, 2005, Aboelela was examined by PA Tucker. Id. at 76. Aboelela reported that he was feeling better, but still feeling weak. Id. Aboelela’s vital signs read normal, his blood pressure was 124/80, his pulse was 84, and his lungs were clear bilaterally. Id. PA Tucker noted that Aboelela’s bowel sounds were active, and the abdomen was soft, non-tender with no masses. Id. He diagnosed Aboelela as suffering from a viral syndrome and determined that no treatment was needed, but that Aboelela needed to increase his fluid intake and keep well-hydrated and recommended that Aboelela maintain a light diet for the next 24 hours. Id.

On December 30, 2005, Health Service Administrator Coleman observed Aboelela at the mid-day meal and referred him to the Health Services Unit. Id. at 76. Aboelela was seen by PA Fasiciana at about 11:30 a.m. Id. PA Fasiciana noted that Aboelela presented yellow sclera and appeared to be jaundiced. Id. Aboelela reported that he had stopped taking his blood pressure medication over the past sevens days "because of how I felt," and that he had "itchy skin all over." Id. Aboelela's weight was 216. Id. PA Fasiciana's diagnosis is stated as: "Chemical hepatitis secondary to INH vs Infectious Hepatitis." Id. PA Fasiciana recommended that Aboelela discontinue the INH immediately, and he notified the pharmacy. Id. The medical records reflect that Dr. Hendershot, a BOP physician from FCI Schuylkill, ordered that Aboelela be placed in the Special Housing Unit ("SHU") and a full laboratory test of Aboelela's liver be conducted "ASAP." Id. The prescription for Isoniazid was immediately discontinued, and an ultrasound evaluation of Aboelela's liver and a repeat measurement of hepatic enzymes were ordered. Id.

On December 30, 2005, Aboelela was admitted to Marian Community Hospital. Id. The diagnosis of the outside

physician was acute jaundice and generalized pruritus secondary to hyperbilirubinemia. Id. at 278-80. In-depth liver work and diagnostic studies were ordered to rule out gall bladder or other liver pathology. Id. at 290-306.

On January 2, 2006, Aboelela reported to pulmonary consultant Dr. Meena Desai that "[h]e himself stopped the medication [INH and pyridoxine[4]]about one week prior to his initial admission." Id. at 301. Later, Aboelela reported that his last taken dose was a "few days ago." Id. at 303. Records indicate that Aboelela accepted his last dose of INH from the pharmacist on December 27, 2005; however, it is unknown whether he ingested that dose of the medicine. Id. at 184.

On January 5, 2006, an esophagogastrodoudenoscopy (EGD) with a biopsy was performed upon Aboelela. Id. at 73, 273-74. The results revealed gastritis, a small hiatal hernia, and H. Pylori infection. Id. The ultrasound studies of the abdomen were normal, and the liver tests showed a decreased level of hepatic enzymes. Id. Prior to his discharge from the hospital,

---

4. Pyridoxine is a vitamin $B_6$ supplement which is prescribed with INH to prevent peripheral neuropathy. See generally, http://www.ncbi.nlm.nih.gov/sites/entrez.

Aboelela's liver enzymes continued to decrease. Id. Hospital staff informed Aboelela of the importance of staying hydrated.

On January 11, 2006, Aboelela was discharged from Marian Community Hospital and returned to the institution. Id.

On January 13, 2006, Aboelela was again admitted to Marian Community Hospital, for continued jaundice, generalized itching, weakness, and nausea. Id. at 244. Aboelela was treated for dehydration, which caused a significant increase in liver-function tests. Id. at 244-45. In response to Aboelela's complaints of abdominal pain, an ultrasound of the gallbladder was taken, which showed functioning with normal results. Id. at 267. In addition, a X-ray of Aboelela's chest was taken. Id. at 255. The findings were normal. Id. It was noted that a previous CAT scan and serology were unremarkable for any viral hepatitis or liver disease. Id. at 253.

On January 16, 2006, it was noted by the hospital physician that Aboelela's condition was improving. Id. at 70, 258.

On January 19, 2006, Aboelela was monitored and released back to the institution. Id.

On February 9, 2006, a referral was written for an outside physician to evaluate Aboelela for INH-induced hepatitis and high cholesterol. Id. at 243.

On February 13, 2006, Aboelela was evaluated by PA Fasiciana during the hypertension and infectious-disease clinic. Id. at 68. Aboelela voiced no complaints during this examination, but did report that he stopped taking his blood-pressure medication upon his self-diagnosis of being “sick.” Id. Aboelela refused any medications suggested to him, was advised to return to the clinic as needed, agreed and stated that he understood. Id.

On May 15, 2006, Aboelela was seen in chronic care clinic by Dr. Bhatti. Id. at 66-67. Aboelela voiced no complaints other then feeling “tired.” Id. Aboelela’s liver was normal, and there was no sign of jaundice. Id. Aboelela was informed that his options for treatment for his positive PPD were limited. Id. Aboelela agreed and decided that he would adhere to a diet plan. Id.

On May 17, May 24, and June 2, 2006, Aboelela was seen by medical staff for routine follow-up care and for routine X-rays. Id. at 63.

On June 26, 2006, Aboelela was seen by Dr. Bhatti for complaints of fatigue and stomach discomfort. Id. at 64. Aboelela was examined and prescribed medication, and it was noted that Aboelela was not compliant with taking the medication he had been prescribed. Id.

On August 4, 2006, Aboelela was seen in chronic care clinic by PA Fasiciana for routine follow-up care. Id. at 62.

On August 14, 2006, Aboelela was seen by PA Fasiciana for left eye irritation. Id. at 61. In addition, a referral was written for Aboelela to see an endocrinologist. Id. at 242. The results from the endocrinologist's testing were normal. Id. at 219-20.

On August 16, 2006, Aboelela was seen by an ophthalmologist regarding his complaints of blurred vision. Id. at 61, 236-242.

On August 23, 2006, Aboelela was seen by Dr. Bhatti for routine lab work. Id. at 60. Based upon Dr. Bhatti's findings of elevated liver enzymes, Aboelela was referred to a hematologist for further review. Id.

On August 24, 2006, Aboelela had a complete eye exam. Id. at 58-59.

On September 12, 2006, Aboelela underwent an MRI for optic neuritis. Id. at 154-55. Results showed no optic nerve abnormalities. Id.

On September 29, 2006, Aboelela was evaluated for complaints of "seeing some spots." Id. at 57. A referral for the ophthalmologist was made. Id. It was determined that Aboelela had uveitis[5] and disc swelling (optic nerve swelling), and medication was prescribed. Id. at 213-17, 234. Thereafter, Aboelela was evaluated and treated on several separate occasions for his eye concerns; and each consultation noted that Aboelela's eye condition was improving. Id. at 39, 41, 44, 49-55.

On November 1, 2006, Aboelela was seen by a hemotologist. Id. at 224-26, 228. There were no abnormal findings reported. Id.

On December 22, 2006, Aboelela was evaluated by an ear, nose, and throat specialist for low TSH (thyroid stimulating

---

5. Uveitis is inflammation of the uvea, which is the vascular layer of the eye sandwiched between the retina and the white of the eye (sclera). See Mayo Clinic's website, at http:// www.mayoclinic.com/health/uveitis/DS00677.

hormone). Id. at 49, 219, 220.  Further testing was ordered prior to implementing a treatment plan. Id.

On February 1, 2007, Aboelela failed to report as scheduled to the chronic care clinic. Id. at 48.

On February 9, 2007, Aboelela was seen by PA Fasiciana for follow-up care. Id. at 46-47.

On March 23, 2007, Aboelela was evaluated by Dr. Bhatti for fatigue. Id. at 45.

On May 8, 2007, Aboelela was evaluated in the chronic care clinic for hypertension. Id. at 42-43.

On June 6, 2007, Aboelela expressed discontent with PA Fasiciana, insisted that he be seen by Dr. Bhatti, and threatened to sue PA Fasiciana. Id. at 40.

On July 17, 2007, Aboelela failed to report to his scheduled sick call appointment. Id. at 40.

On July 18, 2007, Aboelela was evaluated at a sick call visit for Gastoesophageal Reflux Disease (GERD). Id. at 39. The treatment provider prescribed Mylanta and wrote a referral to a GI specialist. Id.

On July 23, 2007, Aboelela had a prescription written for glasses after being examined by an ophthalmologist. Id. at 39.

On August 7, 2007, Aboelela was evaluated by a GI Specialist, who ordered a CAT-scan of Aboelela's abdomen. Id. at 36-38.

On August 15, 2007, the treatment specialist recommended medication (Omeprazole) for Aboelela's chronic GERD. Id. at 37.

On August 17, 2007, Aboelela was evaluated by institution medical staff for complaints of GERD and was prescribed medication. Id. at 36.

On September 25, 2007, Aboelela was transferred from USP Canaan to the Reeves County Correctional Center. Id. at 35.

On June 2, 2008, Aboelela filed the instant action, seeking compensatory and punitive damages for defendants' negligence and deliberate indifference to his medical needs. Specifically, Aboelela seeks damages for defendants' failure to properly monitor his treatment for tuberculosis, thereby causing chemical hepatitis. Id.

With respect to Aboelela's claim, the record reflects that on May 18, 2006, Aboelela filed Administrative Remedy No. 414007-F1, stating the following:

> On Oct. 6, 2005 I was prescribed Pyridoxine & INH therapy for TB after I was required to have a blood test to monitor my chemical/biological reaction of the

above drugs prescribed. I was not given this required blood test, in which the drugs started to effect my liver potentially causing me "Irreparable Harm" which is both historic & current & continuous & an on-going problem: causing me a "Chemical Hepatitis", which is associated with taking this drugs without blood test. I tried to seek remedy verbally through medical staff, Med. Dir. Coleman & was denied, see March 10, 2006. My eventual blood work indicated that my blood is "red flagged" having a high Globulin, bacteria in my stomach caused ulcer if not treated, high cholesterol, Amonia extremely high. I need explain why the warden & Medical Director they refuses to treat my medical problems. First when I ask for a blood test until my liver get effect and suffering for one month. After I make BP8 against Mr. Colemen he finally took me to the local hospital for 3 week with great suffering. Second: After I came back from the hospital in Jan. 20, 2006, until I make another BP8 on May 10, 2006. I been seen by a doctor one time only in Feb. 2006. Until now I still have problems. I respectfully ask what action was taken to improve my condition and Mr. Coleman would be held for his actions.

(Doc. 25-13, Ex. 1, Att. C, Request for Administrative Remedy No. 414007-F1).

On May 30, 2006, USP-Canaan Warden, Cameron Lindsay, granted Aboelela's Request for Administrative Remedy, finding the following:

This in response to your Request for Administrative Remedy, dated May 18, 2006, which was received in this office on May 19, 2006. You request information regarding your medical condition.

Review of your complaint indicates you were evaluated on December 30, 2005, and admitted to an outside

hospital for treatment of a chemical induced hepatitis, which was probably caused by a medication that you were taking. You were placed on this medication on November 2, 2005. Prior to initiating this therapy, baseline blood tests were done and your liver enzymes were not elevated. You were scheduled for repeat studies in two months to monitor your liver enzymes.

During your hospitalization, you received medical diagnosis and care appropriate for your condition. You were discharged from the hospital on January 11, 2006 and returned to the institution where you remained until January 13, 2006, when you stated that you were not feeling well. You were evaluated by clinical staff and readmitted to the local hospital for care and treatment. You did well and were discharged on January 19, 2006, and returned to the institution.

Your laboratory studies were followed after your return and liver enzymes have returned to normal range. Your medication was continued and you have not returned to Health Services with any additional medical issues. You were evaluated by the physician on May 15, 2006. Your condition was considered stable and you were recommended to take medication for high blood pressure, which you refused. The physician ordered additional laboratory studies and recommended follow-up in ninety (90) days. You have also requested and received copies of information maintained in your medical file.

Based on the information above, your Request for Administrative Remedy is granted in that you have been provided information regarding your medical condition. In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(10) to the Regional Director, Federal Bureau of Prisons, Northeast Regional Office, U.S. Customs

House, 2nd and Chestnut Street, Philadelphia, Pa 19106.

(Doc. 25-13, Ex. 1, Att. C, Response to Request for Administrative Remedy No. 414007-F1). The record reveals no further action with respect to Administrative Remedy No. 414007-F1.

## III. Discussion

### A. Bivens Claim

In Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 462 (1975), the Supreme Court stipulated that there is no federal statute of limitations for civil rights actions. See also Owens v. Okure, 488 U.S. 235 (1989). In applying the statute of limitations to a Bivens-type civil rights action, a federal court must employ the appropriate state statute of limitations which governs personal injury actions. Wilson v. Garcia, 471 U.S. 261, 276 (1985); Urrutia v. Harrisburg County Police Dept., 91 F.3d 451, 457 n. 9 (3d Cir.1996); King v. One Unknown Fed. Corr. Officer, 201 F.3d 910, 913 (7th Cir.2000) (noting that the statute of limitations for a § 1983 action and a Bivens action are both governed by the state statute of limitations for personal injury claims). The Wilson Court

clarified that courts considering federal civil rights claims "should borrow the general or residual [state] statute for personal injury actions." Owens v. Okure, 488 U.S. 235, 250, (1989); Little v. Lycoming County, 912 F.Supp. 809, 814 (M.D.Pa.1996). Pennsylvania's applicable personal injury statute of limitations is two years. See 42 Pa. Cons.Stat. Ann. § 5524(7); Kost v. Kozakiewicz, 1 F.3d 176, 190 (3d Cir.1993).

However, the date when a cause of action accrues is still a question of federal law. Smith v. Wambaugh, 887 F.Supp. 752, 755 (M.D.Pa.1995). Under federal law, a civil rights cause of action accrues, and the statute of limitations begins to run, when the plaintiff "knew or should have known of the injury upon which [the] action is based." Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir.1998) (section 1983 action). The limitations period begins to run if a plaintiff has sufficient notice to place him on alert of the need to begin investigating. Gordon v. Lowell, 95 F.Supp.2d 264, 272 (E.D.Pa.2000). Under Gordon, a "claim accrues upon knowledge of the actual injury, not that the injury constitutes a legal wrong." Id.

It is apparent from Aboelela's medical records that on December 30, 2005, he was admitted to an outside hospital, evaluated, and diagnosed as positive for having contracted hepatitis through INH therapy. Aboelela's complaint was not filed until June 8, 2008. "In general, a section 1983 claim accrues when the facts which support the claim are, or should be, apparent to a person with a reasonably prudent regard for his rights and when the identity of the person or persons responsible for the alleged violation is known or reasonably should have been known to the plaintiff." Smith v. Wambaugh, 887 F. Supp. 752, 755 (M.D. Pa. 1995), aff'd, 87 F.3d 108 (3d Cir.), cert. denied, ___ U.S. ___, 117 S. Ct. 611 (1996). (Citations Omitted). The record reveals that Aboelela was fully aware of the diagnosis at the December 30, 2005, hospital evaluation. However, if there was a question as to notice on December 30, 2005, the diagnosis was confirmed by January, 2006, testing. Thus, Aboelela was clearly on notice by January, 2006. Accordingly, Aboelela's claims, not filed until June 8, 2008, are time-barred.

**B. FTCA Claim**

Aboelela claims that BOP medical staff were negligent regarding his initial INH treatment and the subsequent monitoring of his liver function. (Doc. 1, at 11-12). Defendants argue in their dispositive motion that plaintiff's FTCA claim against the United States should be dismissed for plaintiff's failure to file a certificate of merit (COM).

Pursuant to Pa. R. Civ. P. 1042.3, a plaintiff is required to file a COM from a medical expert with respect to a professional negligence claim against the United States.[6]

In Boyd v. U.S., 2006 WL 2828843, * 6 (M.D.Pa.), this Court stated that "[PA] Rule 1042.3 is indeed applicable to state law malpractice claims brought in federal court." Rule 1042.3 applies when federal courts are addressing state law professional negligence claims in both diversity and supplemental jurisdiction cases. The Boyd Court also stated:

---

6. A COM must be filed for a Pennsylvania State professional negligence claim or the claim will be dismissed. Velazquez v. UPMC Bedford Memorial Hospital, 328 F.Supp.2d 549, 558 (W.D.Pa.2004). This Court has found that the COM requirement of Rule 1042.3 applies to cases filed in federal court, and it applies to incarcerated and pro se plaintiffs, such as Aboelela. See Perez v. Griffin, 2008 WL 2383072, * 3 (M.D.Pa.), aff'd. 2008 WL 5351829 (3d Cir.).

> "Under Pennsylvania law, a party filing a professional liability claim must file a certificate of merit in which a professional licensed in the same field supplies a written statement that a reasonable probability exists that the actions of the defendant fell outside acceptable professional standards and that the actions were the cause of harm suffered by the plaintiff. See Pa. R.C.P. 1042.3(a)(1). If a Plaintiff fails to file the required certificate within sixty (60) days of filing the complaint, Defendants may file a praecipe for entry of a judgment of non pros. See Pa. R.C.P. 1042.6

Id., * 5; See also Santee v. United States, 2008 WL 4426060 (M.D.Pa. May 08, 2008); Lopez v. Brady, 2008 WL 4415585 (M.D.Pa. Sep 25, 2008).

Recently, in Perez v. Griffin, 2008 WL 5351829, * 2 (3d Cir.2008) (Per Curiam), the Third Circuit affirmed this Court's finding that the COM rule is a substantive rule of state law that applies in federal court actions. In Perez, the Third Circuit stated, "Rule 1042.3 is a substantive state law that federal district courts must apply." (citations omitted). Id.

In support of their Motion for Summary Judgment, defendants argue, inter alia, that plaintiff's FTCA action should be dismissed against the United States since he did not file a timely COM to support his medical negligence claim against the

United States in violation of PA Rule 1042.3. The Court agrees with defendants' argument.

Plaintiff's complaint was filed on June 2, 2008, Thus, on or before August 8, 2008, Aboelela was required to file, in accordance with PA Rule 1042.3, a COM producing expert testimony to opine that the defendants negligently prescribed INH, breached their duty to monitor Aboelela, and the negligent breach was the proximate cause of Aboelela's injury. The record reveals that no COM was filed, nor is there any record of an enlargement of time within which to file a COM. Thus, the undisputed record shows that plaintiff failed to timely file a COM in this case. Further, plaintiff has not properly explained his failure to file a COM. In fact, plaintiff has made no attempt to challenge the need for a COM or justify his failure to file one.

In light of the recent Perez Third Circuit case, unless Aboelela can show a reasonable explanation or legitimate excuse for his failure to timely file a Rule 1042.3 COM, his FTCA medical malpractice claim against the United States is subject to dismissal without prejudice.

As the District Court in Perez stated:

> Failure to file either a certificate of merit under Rule 1042.3(a) or a motion for extension under Rule 1042.3(d) is fatal unless the plaintiff demonstrates that his or her failure to comply is justified by a "reasonable excuse." Womer v. Hillier, 589 Pa. 256, 908 A.2d 269, 279-80 (Pa.2006) (holding that a court may reconsider judgment entered for failure to comply with Rule 1042.3 if the plaintiff demonstrates a "reasonable excuse" for the noncompliance); see also Pa.R.Civ.P. 1042.6 (authorizing entry of non pros judgment if a malpractice plaintiff fails to comply with Rule 1042.3); Walsh v. Consol. Design & Eng'g., Inc., No. Civ. A. 05-2001, 2007 WL 2844829, at * 5 (E.D.Pa. Sept.28, 2007) ("Rule 1042.3 is subject to equitable considerations and a party who fails to timely file a certificate of merit may be relieved from the requirement where the defaulting party provides a reasonable explanation or legitimate excuse.").

2008 WL 2383072, *2. See also Third Circuit decision in Perez, 2008 WL 5351829, * 2 ("failure to comply with Rule 1042.3 is not fatal to claims of professional liability if the Plaintiff can show 'reasonable excuse' for the noncompliance.") (citing Womer v. Hilliker, 589 Pa. 256, 908 A.2d 269, 279-80 (Pa.2006)).

In Ramos v. Quien, 2008 WL 4949896, *7 (E.D.Pa. Nov 18, 2008), the Court stated:

> Under Pennsylvania law, a court may consider two equitable exceptions when a plaintiff has improperly properly filed a COM: whether the plaintiff has substantially complied with Rule 1042.3 and whether the plaintiff has offered a reasonable explanation or

> legitimate excuse for failure to comply. Womer v. Hillier, 589 Pa. 256, 908 A.2d 269, 276, 279 (Pa.2006).
>
> In Womer, the Pennsylvania Supreme Court upheld the judgment of non pros entered against the plaintiff pursuant to Pa.R.Civ.P. 1042.6 because the plaintiff failed to file a COM at all. Id. at 278. Womer recognized that while compliance with Rule 1042.3 is expected, Rule 1042.3 is subject to two "equitable exceptions." Id. at 276. First, Pennsylvania courts have interpreted Pa.R.Civ.P. 126 to give a trial court discretion to "overlook any 'procedural defect' that does not prejudice a party's rights" if there has otherwise been "substantial compliance." Id. (quoting Sahutsky v. H.H. Knoebel Sons, 566 Pa. 593, 782 A.2d 996, 1001 (2001)) (emphasis in original). Second, a plaintiff may seek relief from judgment for failure to prosecute if the plaintiff offers a "reasonable explanation" or "legitimate excuse" for failure to comply with the COM rule under Pa.R.Civ.P. 3051. See id. at 279, n. 11.
>
> The Womer court noted that an entry of judgment non pros can be appropriate where the plaintiff does not timely file a COM and fails to take any steps to comply with Rule 1042.3. See id. at 278-79. The court rejected the plaintiff's argument that providing the defendant with an expert report in discovery substantially complied with the requirements of Rule 1042.3. See id. at 278. The plaintiff's "honest belief" that it had substantially complied was also not a "reasonable explanation" or "legitimate excuse" for failing to file a proper COM. Id. at 280.

Thus, "in light of the strict interpretation of Rule 1042.3 in Womer, ... [the federal court] was compelled to dismiss the Plaintiff's [negligence] claim without prejudice, but was

equally compelled to allow him to present a 'reasonable explanation or legitimate excuse for non-compliance' with the COM requirement and that 'equitable considerations may excuse noncompliance in the appropriate case.'" Weaver v. Univ. of Pitts. Medical Center, 2008 WL 2942139, *7 (W.D.Pa.) (citation omitted). Accordingly, "federal courts [apply] the two equitable considerations outlined in Womer to determine if an untimely filed COM may be accepted." Ramos v. Quien, 2008 WL 4949896, *8; Santee v. United States, M.D. Pa. Civil No. 07-2207, March 24, 2009 Memorandum and Order (Nealon, J.).

Aboelela has failed to present a "reasonable explanation or legitimate excuse for non-compliance" with the COM requirement. Plaintiff was well aware he was raising a professional negligence claim when he filed his complaint in June 2008, and he did not file, or timely request an extension of time to file, a COM. Moreover, even if Aboelela were completely unaware of this fact, defendants' argument regarding the required COM, contained in their January 9, 2009 Motion to Dismiss or for Summary Judgment, certainly put him on notice. Yet, plaintiff's brief in opposition to defendants' motion makes no mention of his failure to file a COM. Thus, this Court finds that Plaintiff has no reasonable excuse for his

failure to timely file a proper COM in this case. Defendants'

Motion for Summary Judgment will be granted. An appropriate

Order accompanies this Memorandum Opinion.


s/Malcolm Muir
MUIR
United States District Judge

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

SAID ABOELELA, : No. 4:CV-08-1062

Plaintiff : (Complaint Filed 06/02/08)

vs. : (Judge Muir)

F. FASICIANA, et al.,

Defendants

**ORDER**

September 22, 2009

For the reasons set forth in the accompanying Memorandum,

**IT IS HEREBY ORDERED THAT:**

1. Defendants' motion for summary judgment (Doc. 21) is **GRANTED**. Judgment is hereby entered in favor of the defendants and against the plaintiff.

2. Plaintiff's motion for enlargement of time to file a brief in opposition (Doc. 36) is **DISMISSED** as moot in light of plaintiff's brief in opposition, filed on June 29, 2009.

3. The Clerk of Court shall **CLOSE** this case.

4. Any appeal taken from this order will be deemed frivolous, without probable cause, and not taken in good faith.

s/Malcolm Muir
MUIR
United States District Judge